*841 OPINION.
Milliken:
The first issue relates to the action of respondent in holding that nothing of value which may be included in invested capital was paid in for petitioner’s common stock. Petitioner avers that the common stock was issued in part payment for land and plant assets, both being of substantial value. The problem is to determine the actual cash value of that which was paid in for the stock of petitioner. We must determine not the value of the stock in and of itself for invested capital purposes, but the actual cash value of the land and services paid for the same. There is not sufficient direct evidence upon which we may depend, in fixing a value of the property and personal services for which a large block of common *842 stock was issued. However, we are of the opinion, in this case, that we should take into account the various considerations that entered into the various transactions, by reason of which the stock was issued or sold, and from the same we will be enabled to determine the value of the preferred and common stock of petitioner, with a resultant value of the land and personal services paid in for the same.
We find cash of $30,000 was paid for 300 shares of preferred stock subscribed for at the date of incorporation, and petitioner caused to 'be issued to the subscribers 150 shares of common stock as a bonus. There were sold for cash in the open market, 15,350 shares of preferred stock and 7,675 shares of common stock, for $1,535,000. To Cowham and McCourtie were issued 1,850 shares of preferred and 5,300 shares of common in payment for 286 acres of land, and the petitioner, as their agent, sold in the open market for their account 1,850 shares of preferred and 925 shares of common, crediting the proceeds of $185,000 to their account. In addition to a cash payment, the Cowham Engineering & Construction Co. received 4,375 shares of common stock in payment for their services incident to the construction of the plant.
One of the most important assets which the petitioner acquired at date of incorporation was the valuable 286 acres of limestone lands, which McCourtie and Cowham had acquired. Only a short time elapsed after the date McCourtie and Cowham acquired the lands before they were transferred to petitioner. What was the cost of the lands to them? They purchased the lands on their own account, paying therefor, in cash, $247,000, and agreed to cause to be issued to the persons from whom they acquired the lands, 100 shares of preferred stock and 1,250 shares of common stock of a corporation to be organized. The persons from whom they purchased the lands were in a position to be informed as to their true value and certainly McCourtie and Cowham knew of their value when transferring the lands to the petitioner.
That which was paid in for one share of preferred stock and one-half share of common stock, is clearly evidenced by the sales in the open market and the sales of the 1,850 shares of preferred stock and 925 shares of common stock of Cowham and McCourtie, on the basis of $100 for the combination. If we had only the issuance of the 17,500 shares of preferred and 8,750 shares of common stock sold for cash at rate of one share preferred and one-half share of common for $100, our problem would be simple of solution, but we have an additional block of 8,750 shares of common stock, which were issued in part payment for land and services of substantial value.
Cowham and McCourtie paid for the 286 acres of mineral lands, $247,000 in cash and agreed to pay McNider $10,000, or a cost of *843 $257,000, and they received from petitioner, from the sale of 1,850 shares of preferred stock and 925 shares of common stock, $185,000. After the transaction incident to the sale was concluded, whereby all parties to the transaction had received the stock to which they were entitled, we find Cowham and McCourtie left with $185,000 in cash and 8,175 shares of common stock in payment for the transfer of the lands to the petitioner. The difference between $257,000 (cost to Cowham and McCourtie) and the cash received, $185,000, leaves an amount of $72,000, and we think this correctly reflects that which was paid in for the 3,175 shares of common stock held by them, and results in a value of $22.08 for each share of common stock. That which was paid for so large a block of common stock is also representative of that which was jKiid for the entire issue of common stock. We are of the opinion that the services of Cowham Engineering & Construction Co., being a part of the cost of the plant and for which 4,375 shares of common stock were issued, were of a value equal to $22.68 for each share of common stock, or a value for the services paid in of $99,225. It has been shown that large blocks of preferred stock were sold for $100 per share, with a bonus of one-half share of common stock. By subtracting from the sale price of $100, the value of one-half share of common stock, or $11.34, we find a value for the preferred stock of $88.66 per share. Application of the value per share of the common stock to the total issue, 17,500 shares, results in a value of $396,900, and application of the value per share of the preferred stock to the total issue of 17,500 shares, results in a value of $1,551,500, or a total value for both issues of stock of $1,948,450. Eespondent has allowed in invested capital only the par value of the preferred stock, or $1,750,000, thus understating invested capital for all the years by the difference here allowed, or $198,450.
The second issue relates to the value as of March 1, 1913, of the deposits of limestone and clay owned by the petitioner. The issue is common to all the years, due to the deductions allowable for depletion. The determination of quantity, as well as value, is involved.
We are satisfied that the survey of the petitioner’s properties, begun in 1922 and completed in 1924, was careful and thorough- — very much more so than the original prospecting- — and that the results shown satisfactorily establish the content in tons of the deposits of limestone and of clay. We have previously held that an accurate estimate of available reserves was acceptable for computations of depletion, notwithstanding that it was made several years subsequent to the basic date. Kehota Mining Co., 3 B. T. A. 885, and the principle is of evident application in the instant case, where the de *844 posits are fixed in character. Accordingly, the survey is accepted and the reserves are determined, as indicated in the findings of fact.
As to the values of the limestone and clay, on March 1, 1913, reliance by the petitioner rests on opinion evidence. The opinions are those of the promoter of the enterprise, and of an experienced dealer in real estate, who had resided all his life in the vicinity in which the property is located. Their opinions coincided in values of $5,000 per acre for both limestone and clay lands, as of March 1,1913. The real estate dealer testified that in 1912, representing the petitioner, he had offered as high as $5,000 an acre for land immediately south of petitioner’s quarry, but the offer was refused. He further testified that cement and clay lands around Mason City, in 1912 and 1913, were under great demand, amounting to a “flurry.” The only evidence before us as to the fair market value of the property at March 1, 1913, leads to the conclusion that $5,000 per acre is supported for the lands of the petitioner containing limestone and clay, not heavily overburdened, but that such value is of application limited to lands of large available deposits and was the result of peculiar local conditions.
The petitioner lays claim to an area of 274 acres of limestone land to which the value of $5,000 attaches, but we are not convinced that two areas, referred to as divisions 3 and 4, stated to contain 40 acres each, or a total of 80 acres, are properly to be included at such a value. A railroad right of way of undisclosed area through the lands, raises a doubt that the area actually owned by the petitioner was a full 80 acres in extent and a majority of the acreage, due to the heavy overburden and the low content of available limestone, does not classify reasonably as land worth $5,000 an acre. Claim is made to an area of 200 acres of clay lands, but it is in evidence that the clay was found to extend to only a small amount under one of the arbitrary divisions of 40 acres, and we are not satisfied that the entire area of the remaining 160 acres was underlaid with clay so as to have a total value of $800,000.
After careful consideration of all the evidence, we are satisfied that on March 1, 1913, the limestone-bearing lands of the petitioner, of the value of $5,000 an acre, comprised an area of at least 194 acres and its clay lands of the value of $5,000 an acre comprised an area of at least 83.3 acres and we are of the opinion that these lands had a fair market value on that date of $970,000 for the limestone lands and $416,500 for the clay lands.
Relative to the third issue, it is in evidence that the plant was constantly maintained in a condition of the highest efficiency and repair and in the judgment of an experienced official of the peti *845 tioner, based on an intimate knowledge of operating conditions, plant construction and care, the reserve of $702,039.88 charged off of the petitioner’s books at December 31, 1916, was ample, and truly reflected the depreciation actually sustained to that date. There is no evidence whatever, to show that the depreciation sustained was greater than the amount charged off on the books. The respondent has set up a computation of estimated depreciation based on cost, and applying a fixed percentage rate per annum, thereby endeavoring to substitute a “ straight-line ” method for the years gone by, in lieu of the depreciation which was charged off on the books. We have repeatedly held that depreciation is a question of fact and that a readjustment of the depreciation reserve, resulting in a reduction of invested capital, may not be based merely on a formula or method of computation. Cleveland Home Brewing Co., 1 B. T. A. 87; Russell Milling Co., 1 B. T. A. 194; Rub-No-More Co., 1 B. T. A. 228; Otis Steel Co., 6 B. T. A. 358. See also Haugh & Keenan Storage & Transfer Co. v. Heiner, 20 Fed. (2d) 921.
In view of the evidence, we are of the opinion that the reduction of invested capital by the respondent, in the amount of $283,586.03, was unwarranted and should be restored to invested capital for each of the years 1917 to 1920, inclusive.
The fourth issue relates to the amount of invested capital allowable for the year 1917, under the provisions of section 207 of the Revenue Act of 1917.
It is in evidence that 286 acres of land were acquired in 1906 for 7,150 shares of capital stock and were still owned by the petitioner on January 1, 1917, having been depleted in the interim by the extraction of limestone deposits aggregating a definite tonnage. There is an entire absence of evidence that the lands declined in value between March 1, 1913, and January 1, 1914, save to an extent measurable by the tonnage of limestone extracted during that period. From the value determined above, as of March 1, 1913, based on the fair market value, $5,000 per acre for limestone lands and a commensurate value of all other lands, we are satisfied that the lands and reserves owned on January 1, 1917, had a value as of January 1, 1914, in excess of the par value of the capital stock specifically issued for them and find the amount allowable in invested capital for 1917, to be $715,000, the par value of the stock issued for the lands in question.
In the fifth issue, the action of the respondent in reducing current earnings available in 1917 and 1920, for dividends, through the accrual of a tentative tax, is reversed. Appeal of L. S. Ayers & Co., 1 B. T. A. 1135.
*846 The respondent is sustained in the sixth issue, involving special relief under sections 327 and 328 of the Revenue Act of 1918. We discern no abnormality of capital or income and there is, in the record, no evidence thereof, or of gross disparity of tax.
Eeviewed by the Board.
Judgment will he entered on 30 days’ notice, wider Bule 50.